**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

TAMARIO HUNLEY,

        Petitioner,                              07-CR-168-A
                                                               12-CV-718-A
                                                          **DECISION AND ORDER**

        v.

UNITED STATES OF AMERICA,

        Respondent.
_____

In 2007, a grand jury returned a three-count indictment charging Petitioner Tamario Hunley with violations of federal narcotics and firearms laws. Shortly after his arrest, Petitioner's then-girlfriend claimed ownership of the gun and the cocaine at issue in the indictment. However, Petitioner's girlfriend later recanted her earlier statement and claimed that the gun and cocaine belonged solely to the Petitioner. Further complicating matters for Petitioner, shortly before trial, the Government inadvertently destroyed the gun upon which two of the indictment's three counts were based. Petitioner proceeded to a jury trial and was found guilty on two counts. Petitioner was then sentenced to three years' imprisonment and two years' supervised release.

Before the Court is Petitioner's timely motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. As detailed below, Petitioner alleges that his trial counsel was constitutionally ineffective. However, because

1

Petitioner has not cleared the high threshold necessary to establish ineffective assistance of counsel, the Court denies Petitioner's motion.

## Background

### A. Petitioner's Arrest

The facts underlying Petitioner's conviction are straightforward.[1] At approximately 2 a.m. on November 28, 2005, while on routine patrol in a "high drug area," a Buffalo Police officer observed an individual, later identified as Petitioner, exiting a Ford Taurus. *See* TT 3-4. The officer ran a check of the Taurus's license plate number and learned that the license plates were registered to a different car. *Id.* The officer circled the block, returned to the Taurus, re-checked the license plate number, and observed a woman—later identified as Petitioner's then-girlfriend, Delishia Wilson—sitting in the car's front seat. *Id.* at 6. The officer stopped his car and observed Wilson exit the Taurus. *Id.* at 7. Wilson joined Petitioner, and the couple began walking towards the officer's car. *Id.* The officer radioed for assistance and drove towards the couple. *Id.* at 8. Upon reaching them, the officer asked Petitioner and Wilson to approach his car. *Id.* When asked, Petitioner denied having come from the Taurus. *Id.* at 8-9. Instead, Petitioner told the officer that he and Wilson were "just walking to the store to buy some weed." *Id.* at 9.

---

[1] All citations to "TT" refer to the Trial Transcript.

The officer then patted Petitioner down and found car keys in Petitioner's front pocket. *Id.* at 10. By this point, the officer's requested backup had arrived. Using a flashlight, one of the additional officers looked through the Taurus's window and observed a partially-hidden revolver in the front of the car. *Id.* at 10-13. Petitioner was then placed under arrest. *Id.* at 14. Using the keys found in Petitioner's pocket, the officers entered the Taurus, where they recovered the gun and observed in the car's ashtray "two plastic vials with a white-rock-like substance." *Id.* at 14-16. The parties later stipulated that the substance was cocaine base. *Id.* at 227-29.

### B. Destruction of the Gun Recovered from Petitioner's Car

On November 29, 2005, the day after Petitioner's arrest, a firearms examiner employed by Erie County Central Police Services (CPS) completed an "operability report" to ensure that the gun recovered from Petitioner's car did, in fact, operate. *Id.* 192-93. The record does not reveal what, if anything, occurred during the next four years, but in 2009, knowing that the firearm "was slated to be destroyed in a fairly short amount of time," the CPS examiner photographed the gun and restored its serial number, which had been defaced. *Id.* 197-200.

On June 6, 2010—approximately one year after the gun was photographed and shortly before trial was to begin—the gun was destroyed. *Id.* at 215. At trial, the CPS Laboratory Director testified about the CPS's firearm destruction policy. According to that policy, approximately every two years, CPS compiles a list of

firearms that are "scheduled for destruction." *Id.* at 212. That list is then sent to the Buffalo Police Department and the New York State Police; from CPS's list, each police department identifies firearms that the departments would like to be withheld from regularly-scheduled destruction, because, for example, the gun is part of an "active ongoing investigation." *Id* at 212-14. Those guns that are not withheld are melted. *Id.* According to the CPS Laboratory Director, CPS had not "received any request to hold [the] gun [recovered from Petitioner's car] for any purpose." *Id.* at 215.

### C. Wilson's Purported Statement Regarding the Gun and Cocaine

At his trial, Petitioner introduced a notarized document, dated February 22, 2006—approximately three months after his arrest—which stated as follows:

> To whom it may concern, on November 28, 2005, at 2:10 a.m., while sitting in my personal vehicle . . . I, Delishia Wilson [Petitioner's then-girlfriend], had in my possession crack cocaine and a .38 Smith & Wesson handgun. [Petitioner] did not have knowledge of the handgun or the crack cocaine. I am making this statement under my own volition, with no intimidation or coercion. I have already made a statement to my legal representative admitting that [Petitioner] did not knowing [sic] or intentionally commit an unlawful act. *Id.* at 136.

The bottom of the statement contained what Petitioner contended was Wilson's signature. *Id.*

Wilson, who had also been arrested with Petitioner, testified that after the couple's arrest, Petitioner "had asked [Wilson] to take the charge for him because he didn't want to go back to jail because he was on parole." *Id.* at 121. Wilson testified that the statement had therefore been submitted as part of

4

Petitioner's parole revocation hearing which had been commenced as a result of his arrest in this case. *Id.* at 136.

According to Wilson, she agreed to Petitioner's request "[a]t first," because she "didn't know it was that serious." *Id.* at 121. Wilson then testified that she did not "recall signing a statement saying that the gun was" hers. *Id.* at 121-22. However, Wilson also testified that "if there was a statement out there," she did not "deny that [she] intended at some point in time to say the gun was [hers]." *Id.* at 122. Wilson further testified that she "d[idn]'t remember signing" the statement but identified the signature on the statement as hers. *Id.* at 135.

### D. The Indictment, Wilson's Plea Agreement, and Petitioner's Trial

In 2007, a grand jury returned a three-count indictment charging Petitioner with violating: (1) 18 U.S.C. §§ 922(g)(1) and 924(a)(2) for being a felon in possession of a firearm; (2) 18 U.S.C. § 922(k) for possessing a firearm with a serial number that had been "removed, obliterated, or altered"; and (3) 21 U.S.C. § 844(a) for possessing cocaine base. The grand jury also indicted Wilson on counts two and three. *See* Dkt. No. 1.

However, in September 2007, Wilson and the Government entered into a plea agreement pursuant to which Wilson would plead guilty to a misdemeanor count of attempting to possess marijuana. TT at 142-43. The plea agreement's factual basis stated—contrary to the note purporting to be from Wilson—that after Petitioner and Wilson observed the Buffalo Police office driving past Wilson's car

on November 28, 2005, "[Wilson] observed [Petitioner] become nervous and proceed to hide a firearm and crack cocaine in the car. . . . Prior to this, [Wilson] had no knowledge that [Petitioner] was in possession of those items." *Id.* at 146-47. Wilson pleaded guilty to the misdemeanor charge and was sentenced to one year of probation.

Prior to Petitioner's trial, Petitioner's counsel, John Humann, filed a motion to dismiss the two counts of the indictment based on the gun recovered from Wilson's car. Dkt. No. 58. The basis for Humann's motion to dismiss was the government's destruction of the gun. *See id.* The Court denied the motion, explaining that "[a]lthough the Government has not explained exactly why the revolver was destroyed when it was, there is no reason at this time to believe that it was destroyed specifically to prejudice the defendant or because a trial was upcoming." Dkt. No. 73 at 3.

Petitioner's case then proceeded to trial, where, pursuant to her plea agreement, Wilson testified for the Government. During his cross-examination of Wilson, Humann read the factual basis of Wilson's plea agreement to Wilson and questioned her about the inconsistency between the plea agreement and the 2006 notarized statement with Wilson's signature. *See id.* at 145-55. Humann's cross-examination culminated in Wilson's tacit acknowledgment that she had made inconsistent statements. *Id.* at 155 ("Q: So were you lying then or are you lying now? A: Well, that's because we were together and I had cared about him

and he didn't want to go to jail.")  Petitioner did not testify at trial, and the sole witness called in his defense was a New York State parole officer who was not personally involved in Petitioner's parole hearing but who testified that he had reviewed Petitioner's parole hearing file and had located the signed statement purporting to be from Wilson.  *Id.* at 218-25.  At the end of trial, Humann requested—and the Court gave—a jury instruction permitting the jury to draw an adverse inference from the gun's destruction.  *See* Dkt. No. 66; TT at 95.

Petitioner was found guilty on counts one and three of the indictment, i.e., the felon-in-possession and cocaine charges, and was sentenced to thirty-six months' imprisonment and two years' supervised release.  *See* Dkt. No. 99.  Petitioner then appealed his conviction to the Second Circuit Court of Appeals, which affirmed.  *See United States v. Hunley*, 476 Fed. App'x 897 (2d Cir. 2012).

### E. Petitioner's § 2255 Motion

Two months after the Second Circuit affirmed Petitioner's conviction, Petitioner, acting *pro se,* filed a timely motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  *See* Dkt. No. 110.  Petitioner bases his § 2255 petition on his contention that Humann was constitutionally ineffective in two ways:

*First*, Petitioner argues that Humann "was ineffective for conducting an inadequate investigation and poor trial preparation."  *Id.* at 10.  Petitioner claims that because his trial was "going to be a credibility contest" between him and

7

Wilson, "it would have been reasonable for counsel to prepare readily available fact witnesses whose testimony would directly corroborate . . . the defense['s] theory of important facts." *Id.* As a result of this alleged failure to investigate, Petitioner claims that Humann "failed to call fact witnesses on [Petitioner's] behalf"." *Id.*

*Second*, Petitioner argues that Humann "failed to cross examine government witnesses in regards to the destruction of evidence [i.e., the gun] that would [have] revealed a constitutional violation." *Id.* at 4.

## **Discussion**

Petitioner's claim requires him to overcome three steep hurdles. He must first satisfy both prongs of the *Strickland v. Washington*, 466 U.S. 668 (1984), test for ineffective assistance of counsel by demonstrating that his counsel's performance was objectively unreasonable and that Petitioner was prejudiced by that unreasonable performance. If he successfully demonstrates ineffective assistance of counsel, Petitioner must then show, pursuant to § 2255, that his counsel's ineffective assistance had a "substantial and injurious" effect on the jury's verdict. *Fry v. Pliler*, 551 U.S. 112, 122 (2007). For the reasons stated below, the Court concludes that Petitioner's counsel was not constitutionally ineffective. The Court therefore does not reach the "substantial and injurious" question under § 2255.

### A. *Strickland*'s Test for Ineffective Assistance of Counsel

*Strickland*'s familiar two-part test requires Petitioner to prove "deficient performance by counsel resulting in prejudice, with performance being measured against an 'objective standard of reasonableness' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Strickland*, 466 U.S. at 687-88).

*Strickland*'s reasonableness test is meant to prevent Monday-morning quarterbacking of a habeas petitioner's trial counsel. As the Supreme Court noted in *Strickland*, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. There is accordingly a "strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 688).

If the Court concludes that Humann's performance was not objectively unreasonable, the *Strickland* analysis is complete.  *See Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").  However, if Petitioner adequately demonstrates that Humann's performance was objectively unreasonable, Petitioner must then demonstrate that his counsel's unreasonable performance was prejudicial.  "To establish prejudice, a [Petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, considering the totality of the evidence before the judge or jury."  *Park v. United States*, 441 Fed. App'x 18, 19 (2d Cir. 2011) (internal quotation marks omitted).

In this case, Petitioner's claims of ineffectiveness center around his counsel's allegedly ineffective trial strategy, namely, that Humann failed to investigate and call witnesses on Petitioner's behalf and that Humann failed to adequately cross-examine the Government's witnesses.  The Court will address each claim in turn, but the Court begins by noting that *Strickland* imposes a steep barrier to these types of ineffective assistance claims.  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690-91.  Among a lawyer's strategic choices that are generally unassailable on collateral attack are "whether to call any witnesses on behalf of the defendant, and if so which witnesses to

call," as well as "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner." *United States v. Neresian*, 824 F.2d 1294, 1321 (2d Cir. 1987).

### i. Alleged Failure to Adequately Cross-Examine the Government's Witnesses

Petitioner first argues that Humann "failed to cross examine government witnesses in regards to the destruction of evidence [i.e., the gun] that would [have] revealed a constitutional violation." Dkt. No. 110 at 4. The Government's first witness concerning the gun was Stuart Easter, a firearms examiner at the Erie County Department of Central Police Services Forensic Laboratory, who examined and tested the firearm that was recovered from Petitioner's vehicle. TT 187:24-188:1. Humann's cross-examination of Easter did not directly address the gun's destruction. *See* TT 203-06. However, on his re-cross, Humann asked Easter whether "in all the years and all the weapons and guns you've been involved with, those thousands of weapons, do you ever see a screw-up, where it gets mixed up? Somebody loses track of something?" TT 209:16-19. The Court asked Humann to clarify the question, the Government objected, and Humann withdrew the question. TT 209:20-210:5. Humann's re-cross of Easter then ended.

The Government's next witness relating to the gun was John Simich, the laboratory director at the Erie County Central Police Services Forensic Laboratory. As recounted above, Simich testified as to Central Police Services'

11

firearms destruction policy. Humann's cross-examination of Simich was brief—consisting of only three questions—and did not touch upon the firearm's destruction. Instead, Humann asked Simich about the prevalence of DNA testing in 2005, the year in which the gun was recovered. *Id.* 217:11-19. There were no other witnesses relating to the gun's destruction.

Petitioner argues that Humann's allegedly too-brief cross-examination of Easter and Simich was objectively unreasonable. However, "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). Accordingly, "[r]eviewing courts are particularly hesitant to second-guess counsel's cross-examination tactics, mindful that counsel must often rely on trial instinct and human insight in making on-the-spot decisions about the course of attack most likely to unnerve the witness and plant doubt in the minds of jurors." *Harris v. Artuz*, 100 Fed. App'x 56, 57-59 (2d Cir. 2004).

In this case, Humann's brief cross-examination of the Government's witnesses could easily have been part of a sound trial strategy. For example, after ending his cross-examination of Easter with an apparently provocative question about the gun's destruction which drew an objection, Humann could have made the split-second decision that it would be best to let the asked-but-unanswered question linger in the jurors' minds—which he did. *See* TT 209:16-19 (on his final question on re-cross, Humann asked Easter whether "in all the

years and all the weapons and guns you've been involved with, those thousands of weapons, do you ever see a screw-up, where it gets mixed up?  Somebody loses track of something?").  Decisions such as this one, which are based on "trial instinct and human insight in making on-the-spot decisions about the course of attack most likely to unnerve the witness and plant doubt in the minds of jurors," *Harris*, 100 Fed. App'x at 57-59, are choices that reviewing courts are particularly ill-suited to question.

Further, although it does not come through on the cold record, the Government's primary witness relating to the gun's destruction, John Simich, was apparently hostile towards Humann on cross-exam—a point which Humann brought up in his closing argument.  *See* TT 63:20-64:2 ("John Simich, the last government witness, the director of the lab, did he look a little defensive on the stand?  I mean, I was just asking questions, I didn't think I was nasty with him, but he was kind of nasty with me.  Do you think he's willing to admit [that] maybe they screwed up?  That of the thousands of guns that maybe one got screwed up there?  I'm not trying to sell this to you, I don't know if that's what happened.  But it might have happened.").  Humann could well have decided that Simich's behavior spoke for itself and that extensive cross-examination would have been ineffective or counterproductive.

The Court suggests these possibilities not to imply that they were necessarily the basis for Humann's decisions concerning cross-examination.

13

Rather, the Court offers them simply to note that Humann's choices related to cross-examination could easily have been conscious, split-second strategic decisions made by highly capable defense counsel.  These are the sorts of decisions that reviewing courts are loathe to second-guess.  That it may appear in hindsight that "alternative avenues of inquiry" may have been more effective "does not evidence objectively unreasonable representation, for '[e]ven the best criminal defense attorneys would not defend a particular client the same way.'" *United States v. Rodriquez*, 68 Fed. App'x 237, 243 (2d Cir. 2003) (quoting *Strickland*, 466 U.S. at 689).

The Court therefore concludes that Petitioner has not demonstrated that Humann's cross-examination of the Government's witnesses was objectively unreasonable.  Accordingly, the Court need not address *Strickland*'s prejudice prong.

### ii. Alleged Failure to Investigate and Call Witnesses on the Defendant's Behalf

The only witness called on Petitioner's behalf was, as noted above, a New York State parole officer who was not personally involved in Petitioner's parole hearing but who testified that he had reviewed Petitioner's parole hearing file and had located the statement purporting to be from Wilson, which accepted responsibility for possession of the gun and cocaine.  TT at 218-25.  Petitioner argues, however, that Humann, should have "prepare[d] readily available fact witnesses whose testimony would directly corroborate . . . the defense['s] theory

14

of important facts." Dkt. No. 110 at 10.  Specifically, Petitioner argues that because his trial was "going to be a credibility contest" between himself and Wilson, Humann should have called additional witnesses who would support Petitioner's spin on the facts.  At the very least, according to Petitioner, "[t]here is no reasonable trial strategy that would have excluded at least conducting interviews of the alibi witnesses to determine whether they could [have] provide[ed] exculpatory evidence." *Id.* at 14.

"[T]he decision 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'"  *Pierre v. Ercole*, --- Fed. App'x ---, 2014 WL 1243834, at *2 (2d Cir. 2014) (quoting *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000)).  Indeed, the Second Circuit has identified "several legitimate, tactical reasons for failing to call a defense witness."  *Schulz v. Marshall*, 528 F. Supp. 2d 77, 93 (E.D.N.Y. 2007).  Among these reasons, an attorney may decide to not call a witness "where the witness' likely testimony is largely unknown to the attorney before trial," "where the witness is unfriendly to the defendant," or where there is "the potential for opening the door to potentially damaging testimony about the defendant's character, or indeed any line of inquiry harmful to the defense.'"  *Id.* (citing several Second Circuit opinions) (internal quotation marks and citations omitted).

15

Petitioner identifies three witnesses whom he claims Humann should have investigated and called on his behalf: the attorney who represented Petitioner in the state parole revocation hearing in which Wilson's letter was submitted, the "administrative law judge" who presided over his parole revocation hearing, and the "Parole Revocation Specialist who served something like a prosecutor" at the parole revocation hearing. Dkt. No. 110 at 14-15. According to Petitioner, "[Humann] knew or should have known that [these three witnesses] would be able to provide first hand knowledge of the facts surrounding [Wilson's] allegations." *Id.* at 14.

However, the decision to not investigate and call these witnesses is easily categorized as the sort of strategic decision that is largely unchallengeable on collateral attack. *See United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.") (internal quotation marks omitted). For example, Humann could have concluded that these witnesses would have added nothing to Petitioner's case that would not have been duplicative of the testimony offered by the New York State parole officer who did testify at Petitioner's trial. Thus, because these witnesses likely "would have testified in a manner corroborative of another witness" Humann "might well have regarded the testimony as unnecessarily cumulative" and, therefore, possibly inadmissible. *United States v.*

*Luciano*, 158 F.3d 655, 660 (2d Cir. 1998).  In short, Humann could have concluded that it would have been a poor use of his time to interview, prepare, and call these witnesses.  Humann's decision to not investigate and call these witnesses is therefore easily categorized as sound trial strategy which this Court sees no reason to disturb.  *See also id.* ("The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.").

Accordingly, the Court concludes that Petitioner has not demonstrated that Humann's decision to not investigate and call certain witnesses was objectively unreasonable.  Thus, the Court need not address *Strickland*'s second prong.

## Conclusion

For the reasons stated above, the Court holds that Petitioner's trial counsel was not ineffective.  The § 2255 petition, Dkt. No. 110, is therefore denied.

**SO ORDERED.**

Dated: July 29, 2014                                    s/Richard J. Arcara_____
        Buffalo, New York
                                                                         HONORABLE RICHARD J. ARCARA
                                                                         UNITED STATES DISTRICT JUDGE